## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FRANK WAYNE REINKE,<br><br>Defendant. | CR 15-31-BLG-SPW-CSO<br><br>**FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

## I.   <u>INTRODUCTION</u>

Defendant Frank Wayne Reinke's ("Reinke") is charged with two counts of Felon in Possession of a Firearm, in violation of Title 18 U.S.C. § 922(g)(1), and two counts of Possession of Stolen Firearms, in violation of Title 18 U.S.C. § 922(j). *See Superseding Indictment* (*ECF No. 49*).

Judge Watters referred to the undersigned, in accordance with 28 U.S.C. § 636(b)(1)(B) and Fed. R. Crim. P. 59(a), Reinke's Motion to Suppress (*ECF No. 61*)[1] for the purposes of conducting a hearing and

---

[1] "ECF No." refers to the document as numbered in the Court's Electronic Case Files. *See The Bluebook, A Uniform System of Citation, § 10.8.3.*

issuing findings and recommendations.  The motion seeks to suppress evidence recovered as a result of a traffic stop and subsequent search warrant issued by a State of Montana District Judge on November 15, 2013, and evidence recovered during a probationary search conducted on November 21, 2014.  *ECF No. 61*.  Both searches were conducted on an orange Dodge truck, with the Montana license plate number 3C29387.  There are two firearms at issue in each search.  Each set of firearms was determined to be stolen from a Billings residence, owned by W.P.

The Court held a hearing on April 26, 2016, and heard testimony from Robert Lester, Jared Lausch, Joshua Zent, Lamar Clark, Michael Johnson, and Reinke.  Having considered the evidence and the parties' submissions, the Court will recommend that the motion to suppress be denied.

## II.  <u>THE NOVEMBER 15, 2013 SEARCH</u>

### A.  <u>BACKGROUND</u>

At approximately 1:53 a.m., on November 15, 2013, Sheriff's Deputy Robert Lester ("Deputy Lester") was observing traffic at the intersection of US 87 East and Main Street, in Billings, Montana, *ECF*

*No. 62-7* at 1.  He watched a truck turn through the intersection and proceed "down the middle of two eastbound lanes of travel."  *Id.*  Deputy Lester activated his audio/video system and began to follow the vehicle.  *Id.*  Deputy Lester noticed that the vehicle was driving 35 miles per hour in a 45 miles per hour speed zone, but "there was no traffic ahead of the vehicle, nor did the road condition or weather conditions dictate that the operator drive ten miles an hour below the speed limit."  *Id.*  Deputy Lester also watched the vehicle cross onto the fog line.

The officer activated his overhead lights to conduct a traffic stop, but the vehicle failed to respond immediately and continued driving.  The vehicle eventually pulled over at a Town Pump and, as the vehicle pulled over, Deputy Lester noticed the right brake light did not work.  *Id.*

He approached the vehicle from the passenger's side.  He noticed that the driver's eyes appeared glassy and his speech was slow.  The driver was not able to produce a driver's license or registration, but did provide proof of liability insurance.  *Id.*  The driver identified himself as Reinke.  Deputy Lester conducted a records search and verified Reinke's identity.  He learned that Reinke's driver's license was expired.  *Id.*

During the stop, Deputy Lester noticed that the passenger, who identified herself as Heather Brawley ("Brawley"), appeared to be nervous, and her hands were trembling. Deputy Lester also noticed a liquor bottle at her feet. *Id.* She stated that there was an outstanding warrant for her arrest that she had just learned about. Deputy Lester then asked her to step out of the vehicle, frisked her, and placed her in the back of his patrol vehicle while he verified there was an active arrest warrant for her from the City of Billings.

Deputy Lester returned to the vehicle, asked Reinke to exit and walk towards his patrol vehicle. He frisked Reinke, and informed him that he was going to conduct an investigation to determine if he was impaired. *Id.* He conducted three tests on Reinke. The first was the Horizontal Gaze Nystagmus test. Deputy Lester noticed that his eyes tracked evenly, but that his pupils were constricted and equal in size. He noticed that no matter how much light he placed on Reinke's face, the pupils did not change in size. *Id.* Based on his experience as a certified Drug Recognition Expert, he believed that Reinke had consumed a type of drug that causes the pupils to restrict. This drug type of drug falls into the Narcotic Analgesic category. *Id.*

Deputy Lester's records check revealed that Reinke and Brawley had criminal histories that included drugs and burglary. He asked Reinke for consent to search the vehicle, but Reinke told him that it was not his truck, it was his grandmother's. He refused consent. At this time, Deputy Lester asked Billings Police Officer Lausch to conduct a dog sniff of the vehicle. Officer Lausch had arrived with a narcotics detector dog while Deputy Lester was conducting the field sobriety tests. The dog is trained to detect the odor of four controlled substances, marijuana, cocaine, heroin, and methamphetamine. *Id.* at 6.

Deputy Lester returned to his vehicle and told Reinke he was going to write him a ticket and a warning, and then he would be free to go. Meanwhile, the dog indicated to the presence of narcotics on the driver's side door. *Id.* at 4. Deputy Lester issued Reinke a citation and a warning, and he was released. Deputy Lester then requested the vehicle be towed to the City of Billings Impound Lot. Deputy Anderson proceeded to search Brawley's backpack, but the search did not reveal any illegality. *Id.* at 5.

On the same day, Officer Jordan Aguilar ("Officer Aguilar")

obtained a search warrant for the vehicle. *ECF No. 63-1* at 8–9. As a result of the search, drug related items were seized from the vehicle. Officers took pictures of two firearms found in the vehicle, a Ruger model 10/22, .22 caliber semi-automatic rifle, with a serial number of 259-76677, and a Browning model BL22, .22 caliber lever action rifle, with a serial number of 03518PX126. *ECF No. 62*-6. At that time, the officers did not know that Reinke was prohibited from possessing firearms, or that the firearms were stolen. The firearms were later returned to Reinke with the vehicle.

### B. **PARTIES' ARGUMENTS**

Reinke argues that there was not probable cause to search the truck because the search warrant was issued based on information obtained from an unreasonable extension of the traffic stop. *ECF No. 62* at 2–3. He argues that the duration and scope of the traffic stop was unreasonable and disproportionate to the suspected offenses of operating a vehicle while under the influence, driving with a suspended driver's license, and driving with a broken tail light. *Id.* at 2. He argues the officer had no evidence that there would be drugs in the car, and that Reinke's detention was impermissibly prolonged to call in the

drug-sniff dog.  *Id.*  As a result, he argues that the truck was seized without probable cause, and the subsequent search warrant was invalid.  *Id.* at 2–3.

The United States argues that Deputy Lester had reasonable suspicion to justify prolonging the traffic stop to conduct a dog sniff of the vehicle.  *ECF No. 65* at 9.  The United States argues that the Deputy's reasonable suspicion was based on a number of suspicious indicators, including Defendant's erratic driving, failure to initially stop, glassy eyes, oddly slowed speech, indications of intoxication, lack of valid driver's license, lack of vehicle registration, criminal history, active warrant for the passenger, and constricted pupils.  *Id.* at 10–12. The United States argues that Deputy Lester's observations constituted the reasonable suspicion necessary to prolong the stop in order to conduct the drug-sniff of the vehicle and that the once the drug sniff indicated to the presence of drugs in the vehicle, the officers had probable cause to seize the vehicle and obtain a search warrant.  The United States concludes that there was no violation of the Fourth Amendment, and the evidence of firearms found in the vehicle should not be suppressed.  *Id.*

In his post-hearing supplemental brief, Reinke argues that the stop was not justified. *ECF No. 73* at 3. He argues that the video shows Reinke was not driving in the middle of the road, and that driving 10 miles per hour under the speed limit, and touching the fog line are not a violations of Montana law. *Id.* at 4–8. As a result, Reinke argues that Deputy Lester did not have reasonable suspicion to effectuate a traffic stop, and the stop was impermissibly prolonged to conduct a dog sniff of the vehicle. He argues that because the subsequent search warrant was based on these violations, the search warrant lacked probable cause. *Id.* at 11.

In response to Reinke's supplemental brief, the United States argues that the stop was lawfully effectuated because the testimony demonstrates Reinke was driving down the middle of two lanes of traffic, in violation of Montana law. *ECF No. 74* at 2. The United States concedes that it is difficult to determine from the video whether the truck was driving down the middle of two lanes of traffic, but argues that Deputy Lester testified that, although it was hard to see in the video, the truck failed to maintain a single lane of traffic. *Id.* at 2–3. The United States argues that based on Deputy Lester's observations

that the truck went from driving down the middle of two lanes of traffic, to touching the fog line, and proceeding 10 miles under the speed limit, Deputy Lester had reasonable suspicion that the driver of the truck was driving under the influence, and properly effectuated a traffic stop. *Id.*

Next, the United States argues that Deputy Lester had reasonable suspicion to prolong the stop because he noticed Reinke had glassy eyes and slurred speech, the passenger was extremely nervous and admitted to having an active warrant for her arrest, Reinke did not have a valid driver's license, and the truck had a broken tail light. *Id.* at 3–5. The United States argues that the reasonable suspicion was further supported by the results of the field sobriety tests that provided indications that Reinke had consumed a narcotic analgesic. *Id.* Based on all of these factors, and the criminal histories for Reinke and the passenger, the United States argues that Deputy Lester had reasonable suspicion that there were drugs in the vehicle to justify a dog sniff of the vehicle. *Id.*

Finally, the United States argues that even though Deputy Lester had reasonable suspicion, it is difficult to say the stop was actually prolonged. *Id.* at 5. It argues that Deputy Lester explains in the video

that he was going to write the tickets for Reinke while a different officer conducted the dog sniff of the vehicle. *Id.* It argues that the dog sniff created probable cause within a few moments of Deputy Lester returning to his car to start writing the tickets. *Id.*

## C.  <u>LEGAL STANDARD</u>

On a motion to suppress evidence, the "officer has the initial burden of production" to show "specific articulable facts to justify a reasonable suspicion." *U.S. v. Willis*, 431 F.3d 709, 724 (9th Cir. 2004) (internal quotations omitted). The Defendant, however, "has the ultimate burden of proof." *Id.*

The United States Supreme Court has held that an officer must have reasonable suspicion to conduct a dog sniff of a vehicle as a result of a traffic stop if the dog sniff prolongs the stop beyond the time necessary to address the traffic violation itself. *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1614 (2015). Tasks involved in addressing a traffic violation include ordinary inquiries incident to the stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* But if a stop is

prolonged beyond these tasks, an officer needs reasonable suspicion. *Id.*

Reasonable suspicion is more than a mere hunch but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion may exist even where "factors which by themselves were 'quite consistent with innocent travel' collectively amounted to reasonable suspicion." *Id.* (citing *U.S. v. Sokolow*, 490 U.S. 1, 9 (1989)). Thus, courts must examine, based on the totality of the circumstances, "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *U.S. v. Cortez*, 101 S. Ct. 690, 695 (1981)). Considering the totality of the circumstances "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Id.*

To determine whether a prolonged stop is justified in duration, the Court considers "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions

quickly, during which time it was necessary to detain the defendant."

*U.S. v. Sharpe*, 470 U.S. 675, 686 (1985).

**D.    ANALYSIS**

The primary issues here include whether the traffic stop was valid, whether the traffic stop was prolonged to conduct a dog sniff of the vehicle, and if it was prolonged, whether Deputy Lester had reasonable suspicion to justify prolonging the stop.

**1.    Validity of the Traffic Stop**

Deputy Lester testified that he watched a truck drive down the middle of two lanes of traffic.  He proceeded to follow the truck and noticed that it touched the fog line and was driving 10 miles per hour under the posted speed limit.  He testified that there was no obvious reason for the slow speed, and based on all of these factors, he was concerned about a potential DUI.  Reinke argues that the video contradicts this testimony, but the Court disagrees.  It is impossible to clearly discern from the video where the truck was in relation to the lanes.  Additionally, Deputy Lester testified that even though the video is dark and it is hard to see the lanes, he remembers seeing Reinke drive down the middle of the two lanes after the turn.  The Court finds

this testimony to be credible.

Here, Reinke's failure to maintain a single lane when he drove down the middle of two lanes of traffic violated Montana law. The Court finds that Deputy Lester had reasonable suspicion, based on the totality of the circumstances to pull the truck over.

## 2. <u>Whether the Stop was Prolonged</u>

The Court must next determine whether the stop was prolonged in order to conduct a dog sniff of the truck. Based on the evidence before the Court, Deputy Lester continued to find particularized factors that supported continued detention. Deputy Lester found that: (1) Reinke did not immediately respond to the Deputy's attempt to stop the vehicle; (2) the vehicle had a broken taillight; (3) Reinke was unable to produce a valid driver's license or identification; (4) Reinke had glassy eyes and was slurring his speech; (5) Reinke did not have the registration for the vehicle, though he did provide proof of liability insurance; (6) a records check verified Reinke's identity but showed he did not in fact hold a valid driver's license; (7) the passenger appeared to be very nervous and her hands were trembling; and (8) Deputy Lester saw a liquor bottle in the car at the passenger's feet. *ECF No.*

*63-1* at 3–4.  The passenger eventually identified herself as Heather

Brawley, and indicated there was an active warrant for her arrest.

Deputy Lester took the necessary steps to deal with Brawley.  *Id.* at 4.

A traffic stop must necessarily include those ordinary inquiries incident

to the stop.  *Rodriguez*, 135 S. Ct. at 1614.  All of these factors

uncovered during Deputy Lester's ordinary inquiries justified further

investigation by Deputy Lester.

Deputy Lester returned to the vehicle for a third time, after all of

the above factors were uncovered, to investigate whether Reinke was

driving under the influence.  Deputy Lester, a certified Drug

Recognition Expert, asked Reinke to exit the vehicle and conducted

three field sobriety tests on Reinke.  *Id.*  Two of the tests did not show

signs of intoxication.  One test, the walk and turn test, showed three of

the eight clues for intoxication.  He lost balance during the instructional

phase, he did not perform the turn as demonstrated, and he stopped

walking.  Deputy Lester did not conclude, on this basis, that Reinke was

under a high enough level of intoxication to arrest him, but believed

that Reinke had consumed a type of Narcotic Analgesic.  Deputy Lester

believed Reinke had consumed this type of drug because Reinke's pupils

were equal in size and restricted, and they did not change in size no matter how much light was added or taken away. *Id.* Reinke's argument that he suffered from Bell's Palsy, and the condition prevented his pupils from restricting only supports Deputy Lester's observations.

The Court must give due weight to the factual inferences drawn by the law enforcement officer. *Arvizu*, 534 U.S. at 277. Deputy Lester knew from his training and experience that when a person's pupils were restricted it was a symptom of having consumed a Narcotic Analgesic. Reinke agrees that his pupils were restricted. Deputy Lester also knew, based on a local records check, that Reinke's criminal history included a recent drug-related conviction. As a result of all of these factors, Deputy Lester asked for consent to search the vehicle, but Reinke denied consent.

It is at this point in the traffic stop that Reinke argues Deputy Lester should have let him go. But the necessary tasks involved in the traffic stop had not yet been completed. Officer Lausch arrived on the scene while Deputy Lester was concluding with the field sobriety tests. Deputy Lester had not yet started writing the ticket and the warning

for the two violations he observed. Deputy Lester proceeded to ask Officer Lausch to conduct a dog sniff of the vehicle with his narcotics dog, Renzo, while Deputy Lester returned to his vehicle to begin writing the ticket and the warning. Renzo indicated to the presence of narcotics in the vehicle before Deputy Lester could finish the necessary tasks involved in the traffic stop.

Deputy Lester then issued Reinke a citation for operating a motor vehicle without a valid driver's license, and a written warning for the broken brake light, and released Reinke. *Id.* Prior to this, the officers had probable cause from the dog sniff to seize the vehicle.

Based on the unfolding events, the Court finds that the stop was not prolonged to conduct a dog sniff of the vehicle. Deputy Lester was diligent in pursuing the purpose of the traffic stop. As the stop progressed, he continued to find additional violations of the law that needed to be addressed. He pursued his DUI investigation, which was a primary reason for the traffic stop, but he also had to deal with Reinke's two other violations—driving without a valid driver's license, and driving with a broken tail light. Deputy Lester did not stop to conduct the dog sniff of the vehicle, but had another officer conduct the dog sniff

while Lester indicated he was going to write Reinke a citation and a warning. *See Arbitrator 360 Video at 2:12:42 AM.*

The Court finds, based on these circumstances, that Deputy Lester did not prolong the stop to conduct the dog sniff. He diligently pursued the purpose of the traffic stop and had not yet completed the necessary tasks involved in the stop when the dog indicated to the presence of narcotics in the vehicle.

### 3. <u>Reasonable Suspicion</u>

Based on the findings discussed above, the Court need not consider whether there was reasonable suspicion to conduct the dog sniff. But, even if the stop were slightly prolonged and thus reasonable suspicion was required, the Court finds that Deputy Lester had reasonable suspicion. Looking at the totality of the circumstances, Deputy Lester had a particularized and objective basis for suspecting legal wrongdoing. From the time Deputy Lester began to effectuate the traffic stop, he continued to observe not only particularized factors that led him to believe there was criminal activity occurring, but he also observed additional violations of the law, including a broken taillight and driving without a valid driver's license.

Deputy Lester drew on his own specialized training to make inferences about what may have been occurring, and was highly concerned that the Reinke had consumed a particular type of drug, a Narcotic Analgesic. Based on the circumstances, he had reasonable suspicion to justify the slight prolonging of the stop to conduct the dog sniff of the vehicle.

For all of these reasons, the Court finds that the factors cited by Deputy Lester constitute reasonable suspicion. He acted diligently in having a different officer conduct a dog sniff of the vehicle while he proceeded to issue citations to the driver and deal with the valid arrest warrant for the passenger. Reinke cites no other evidence to suggest that the affidavit submitted with the search warrant application contained "intentionally or recklessly false statements or misleading omissions[.]" *U.S. v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

Accordingly, the Court recommends that Reinke's motion to suppress the evidence obtained from the search warrant issued on November 15, 2013, be denied.

## III.   THE NOVEMBER 21, 2014 SEARCH

### A.   BACKGROUND

On November 21, 2014, Officer Johnson and Officer Kramer were
dispatched to Reinke's residence in Billings, Montana. *ECF No. 62-1* at
1. The officers were responding to a report that Reinke and another
male had fled from Reinke's probation officers. The officers were unable
to locate Reinke and the other man but met with the probation officers,
Lamar Clark ("Clark") and Joshua Zent ("Zent"). Clark and Zent
advised the officers that Reinke had a valid warrant out for his arrest,
and was living in the camper at the scene and drove the truck parked
nearby.

Clark testified at the hearing that he knew Reinke frequently
used the truck and he had seen Reinke driving it numerous times.
Additionally, Reinke admitted that he had frequently used the truck in
the past and had been pulled over while driving the truck at least 13
times between 2012 and 2014, and a number of times prior to that. He
argued, however, that he had stopped using the truck shortly before
this search, when his mother revoked his driving privileges. He said
she would not let him use the vehicle because he had a suspended

driver's license at the time. But from his frequent use of the truck, it was reasonable for Clark and Zent to assume Reinke had access to the vehicle.

Clark and Zent testified that the driver's side door of the truck was open and they could see two bottles of alcohol and a police scanner on the driver's seat. One of the bottles was almost empty. After Reinke fled, Clark and Zent searched the truck and found two firearms and a pair of bolt cutters. The firearms were identified as a Ruger model 10/22, .22 caliber semi-automatic rifle, with a serial number of 826-23376, and a Browning model BL22, .22 caliber lever action rifle, with a serial number of 06325ZX242.

## B. PARTIES' ARGUMENTS

Reinke initially argued that Alternatives, Inc. did not have a contract with Yellowstone County and did not have the legal authority to perform misdemeanor probation services, but has since abandoned that argument. *ECF No. 64*.

Reinke's only remaining argument regarding the November 21, 2014 search, is that the search of the truck was performed without reasonable suspicion. *ECF No. 62* at 13. He argues that the reports

indicate he left a camper and fled, but the probation officers had no

reasonable suspicion that any improper behavior or conduct involved

the truck. *Id.* He also argues that the truck was owned by Reinke's

mother, who did not give them permission to search it, and thus the

search was unlawful. *Id.*

The United States argues that Clark and Zent had reasonable

suspicion that Reinke was engaged in legal wrongdoing, and that he

had violated the terms of his probation and pretrial release. *ECF No.*

*65* at 14. It argues that the probation officers were already aware a

warrant had been issued for Reinke's arrest, prior to arriving at his

place of residence. *Id.* The United States argues that knowledge of an

active arrest warrant can establish reasonable suspicion, but that their

suspicion went far beyond the arrest warrant. *Id.* at 15. It argues that

when the officers arrived at Reinke's residence, Reinke saw them, put a

padlock on his trailer, and fled from the officers. The United States

argues that all of these actions demonstrate violations of his probation.

*Id.*

After Reinke fled, the probation officers approached the residence

and Reinke's truck, and the United States argues that because two

bottles of alcohol and a police scanner were visible, the probation officers had additional reasonable suspicion to search the truck. *Id.* at 18. The United States argues that these items demonstrated violations of Reinke's conditions of release. The United States argues that the probation officers saw Reinke accessing the truck prior to fleeing and left the driver's side door open after he ran away. *Id.* at 19. The United States also argues that this gave the officers reason to search the vehicle.

Finally, the United States argues that the ownership of the vehicle is not determinative or relevant here because the Defendant was using the vehicle, and was subject to search upon reasonable suspicion. *Id.* at 20. The United States argues that even if it was owned by someone else, Reinke cannot invoke the rights of another person and that if it was his mother's vehicle, he had no expectation of privacy in it, and the search could not have violated his rights. *Id.* at 20–21.

In the supplemental briefs, each party essentially reiterates the arguments made in the initial briefs, with Reinke emphasizing that he had no connection to the truck at the time of the search. *ECF No. 73.*

## C.    **LEGAL STANDARD**

Under the Fourth Amendment, the reasonableness of a search is generally determined by considering the totality of the circumstances, and weighing the degree to which the search intrudes on an individual's privacy against the degree to which it is needed for the promotion of legitimate governmental interests. *U.S. v. Knights*, 534 U.S. 112, 119 (2001). The Supreme Court has found that a search conducted on a probationer subject to a search condition is a factor in this determination. *Id.* In *Knights*, the Court found that an officer only needed reasonable suspicion to conduct a search of a probationer's home, where the probationer was subject to a search condition, and the officer knew of the search condition. *Id.* at 119–122.

Reasonable suspicion is more than a mere hunch but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). Thus, courts must examine, based on the totality of the circumstances, whether an officer "has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (quoting *U.S. v. Cortez*, 101

S. Ct. 690, 695 (1981)). Considering the totality of the circumstances

"allows officers to draw on their own experience and specialized training

to make inferences from and deductions about the cumulative

information available to them that 'might well elude an untrained

person.' " *Id.*

### D.   <u>ANALYSIS</u>

Reinke signed his conditions of probation on May 5, 2014.

*ECF No. 62-2* at 1.  One of those conditions provided:

> Upon reasonable suspicions, as ascertained by the Probation
> Officer, my person, vehicle, and/or residence may be
> searched at any time, day or night, without a warrant by a
> Probation Officer, or Law Enforcement Officer (at the
> discretion of the Probation Officer).  I may also be searched
> at my place of employment.  Any property or contraband
> seized may be destroyed.

*Id.*  Reinke's probation officers, Clark and Zent, were familiar with

his conditions of probation and knew he was subject to the search

condition.  Another condition of probation to which Reinke had

agreed provided:  "I will make myself available to my Probation

Officer as requested."  *Id.*

When Clark and Zent arrived at Reinke's residence, they

were aware a warrant for his arrest had been issued based on

previous violations of his probation.  Reinke saw Clark and Zent when they arrived at the scene.  They testified that, after Reinke saw them, he put a padlock on the camper the officers thought he was living in and fled the scene.  *ECF No. 65-2* at 1.  Next to the camper was the truck that Clark knew Reinke frequently drove in the past, and still believed he was using.  His flight violated the terms of his probation.

From the open door of the pickup, Clark and Zent observed two bottles of liquor and a police scanner.  *Id.*  Reinke is not allowed to possess or consume alcohol as a condition of his release, and the officers reasonably believed that this was another violation of Reike's probation.  *ECF No. 65-4.*  Clark and Zent concluded, based on their observations, that they had reasonable suspicion to search the truck.  In the vehicle they found two firearms, which are now at issue.

The Court finds that Clark and Zent had reasonable suspicion to search the truck.  They were aware he was in violation of numerous conditions of his probation.  The probation officers knew that Reinke regularly used the vehicle and was

subject to the search condition Reinke signed on May 5, 2015. Based on Reinke's actions when Clark and Zent arrived on scene, they had reason to believe there was criminal activity occurring. Looking at the totality of these circumstances, the Court finds the probation officers had reasonable suspicion to justify the search of the truck.

Next, Reinke argues that the search was impermissible because the vehicle was not owned by him, and the owner did not give the probation officers permission to search it. *ECF No. 62* at 13. This argument is unpersuasive. The probation officers knew that Reinke frequently used the vehicle. Clark testified that he had seen Reinke driving the truck numerous times and, at the time of the search, thought Reinke used the vehicle. Although Reinke testified that he stopped using the vehicle in April or May of 2014, because his driver's license had been suspended, the Court does not find this testimony to be credible. As evidenced in the November 15, 2013 search discussed above, Reinke did not have a valid driver's license at that time and yet he was still driving the same truck at issue in this search.

On a motion to suppress evidence, Reinke must demonstrate he had a legitimate expectation of privacy in the place that was searched, because "the Fourth Amendment protects 'people, not places[.]' " *U.S. v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) (quoting *Katz v. U.S.*, 389 U.S. 347, 351 (1967)). The Court is only determining whether the search violated Reinke's rights. If he did not use the vehicle, he would have no expectation of privacy. If he did, it was subject to search based on his probation condition. As discussed above, the Court finds that Reinke's probation officers had reasonable suspicion to search the vehicle.

Accordingly, the Court recommends that the motion to suppress the evidence seized as a result of this search be denied.

## IV.    **CONCLUSION**

Based on the foregoing, IT IS RECOMMENDED that Reinke's Motion to Suppress (*ECF No. 61*) be DENIED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that objections to these Findings and Recommendations are waived unless

filed and served within fourteen (14) days after the filing of the

Findings and Recommendations.  28 U.S.C. § 636(b)(1)(B); Fed. R. Crim.

P. 59(b)(2).

DATED this 5th day of May, 2016.

/s/ Carolyn S. Ostby
United States Magistrate Judge